UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

VERSUS

AMADOU O. BARRY

CRIMINAL ACTION

NO. 12-CR-080-JBB

**RULING ON DEFENDANT'S MOTION TO SUPPRESS**

This matter is before the Court on a motion to suppress (doc.15) by Defendant, Amadou O. Barry ("Barry"). Barry is charged with trafficking in counterfeit goods in violation of 18 U.S.C. § 2320(a). Barry moves to suppress items seized by, and statements made to, investigating officers pursuant to two signed waiver forms. The United States of America ("Government") filed a response (doc. 21). An evidentiary hearing was held on August 22, 2013. For the reasons stated herein, the Defendant's motion to suppress is GRANTED.

I.   Factual Background

The Court makes the following findings of fact based upon evidence presented at the evidentiary hearing. Barry is a citizen of Guinea, Africa with a Lawful Permanent Residence Card. He is a native speaker of Fulani, a West African dialect, but he has some proficiency in French. Barry has been in the United States since September 18, 2003. He first lived in New York City, where he eventually attained a driver's license and worked as a cab driver. He has since moved to Baton Rouge where he started Barry's Fashion, the business involved in the present controversy.

On March 17, 2011, Homeland Security Investigations ("HSI")/Immigration and Customs Enforcement ("ICE"), as well as other supporting law enforcement agencies, conducted an enforcement operation at a local Baton Rouge flea market rumored to be trafficking in

1

counterfeit goods. During the operation, Special Agent Tag Gernados ("Agent Gernados") observed Barry sitting behind a booth of suspected counterfeit goods. Agent Gernados approached Barry and explained the purpose of law enforcement's presence. After the initial introduction, Barry took Agent Gernados to a private back room. Therein, Agent Gernados observed what he believed to be counterfeit items and decided to conduct a search for counterfeit goods. Before undertaking the search, Agent Gernados read a waiver of rights form and a consent to search form to Barry aloud. He then handed the forms to Barry for him to read silently before signing them. Though he did not ask, it appeared to Agent Gernados that Barry read and understood both forms.

While in the private room, Agent Gernados conducted an interview with Barry. Agent Gernados was wearing plain clothes with his badge worn around his neck and tucked inside his shirt. During the interview, Barry explained to Agent Gernados that he received the counterfeit goods from Chinese distributors in New York City that he met while living there. He would then affix designer labels to the goods and sell them. Barry averred that he did not know that his actions were illegal and if he did, he would not have done them. After the interview, Agent Gernados seized the counterfeit goods and informed Barry that he would not be charged for an offense on this occasion.

On May 4, 2013, HSI/ICE and supporting law enforcement agencies returned to the flea market to conduct another enforcement operation. There again, Agent Gernados, along with Agent Jeff Bourgeron ("Agent Bourgeron") from the Louisiana Attorney General's Office, observed Barry behind a booth with suspected counterfeit goods. Similar to the first encounter, Barry led both agents to a private room in the back. Upon entering the room, the agents observed what they thought to be counterfeit goods. They then decided to conduct a search of

the room.  Before conducting the search, the agents read the waiver of rights and consent to search forms aloud to Barry and gave them to him to read before signing.  They did not ask Barry if he read and understood the forms but it appeared to the agents that he did.

During the second interview, Barry gave an explanation as to why his business was still in operation.  The interview revealed facts that resulted in the agents seizing boxes containing counterfeit goods that were taken as evidence.  Now, Barry seeks to have the items seized and the statements made during this interview excluded by claiming that they were attained pursuant to invalid waivers of his constitutional rights.

## II. Discussion

At issue here are the two forms that Barry signed during the course of an interview conducted during the HSI/ICE enforcement operation.  The first, a "Statement of Rights" form, affirmatively waived Barry's *Miranda* rights.  The second, a "Consent to Search" form, gave law enforcement permission to search and seize property from a private back room without the need of a properly executed warrant.  Barry does not contest the fact that the two forms were read aloud to him, given to him to read, and then signed.  Instead, he argues that his waivers were invalid because a language barrier, his illiteracy, and lack of a formal education precluded him from voluntarily and knowingly waiving his rights.  The Court agrees.

### a. Waiver of *Miranda* Rights

A defendant may waive his *Miranda* rights so long as it is done voluntarily, knowingly, and intelligently.  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  The government bears the "heavy burden" to prove that the defendant voluntarily, knowingly, and intelligently waived his rights.  *Miranda v. Arizona*, 384 U.S. 436, 475 (1966).  To determine if the government has

satisfied this burden, the Court must find that the waiver was "the product of a free and deliberate choice" free from "intimidation, coercion, or deception," and that the waiver was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421. This finding is made on a case-by-case basis in light of the totality of the circumstances. *U.S. v. Cardenas*, 410 F.3d 287, 293 (5th Cir. 2005).

Not at issue here is whether law enforcement used intimidation, coercion, or deception, which would preclude a finding that Barry's waiver was a product of a free a deliberate choice. Agent Gernados was in plain clothes, his badge was tucked inside of his shirt, and he in no way attempted to coerce or intimidate Barry. Additionally, Barry invited Agents Gernados and Bourgeron into a back private room to conduct the interview on his own initiative. Instead, the Court finds that the Government has failed to meet its burden to prove that Barry was fully aware of the nature and consequences of his decision to waive his rights.

When a case involves a non-native speaker of the English language, courts consistently hold that a waiver is valid when the rights are translated into the suspect's native tongue. *U.S. v. Robles-Ramirez*, 93 F.Supp.2d 762, 764 (W.D. Tex. 2000). That said, this line of precedent is not particularly helpful in the present case because there was no use of a translator. Therefore, the Court turns to a list of factors used by the Ninth Circuit to aid it in arriving at its conclusion. *See U.S. v. Amano*, 229 F. 3d 801, 804 (9th Cir. 2000) (citing *U.S. v. Garibay*, 143 F.3d 534, 538 (9th Cir. 1998)). When a case involves a foreign national, courts therein will assess the voluntariness of the waiver according to a list of factors including: 1) whether the defendant signed a written waiver; 2) whether the defendant was advised of his rights in his native tongue; 3) whether the defendant appeared to understand those rights; 4) whether the defendant had the

assistance of a translator; 5) whether the defendant's rights were explained painstakingly; and 6) whether the defendant had experience with the American criminal justice system. *Id.*

Here, several factors weigh against finding that the waiver was valid. Barry, a native speaker of Fulani with a limited knowledge of French, did not receive the warnings in his native tongue. Additionally, he did not have the assistance of a translator.[1] Finally, though Agent Gernados read Barry the rights aloud, it does not appear that he did so "individually and repeatedly". *Garibay*, 143 F.3d at 538 (finding an explanation insufficient where the constitutional rights were not individually explained and repeated). This may not have been done because, as Agent Gernados testified, Barry appeared to read the forms and understand the nature and consequences of his waiver. However, the Court is profoundly troubled by the fact that Agent Gernados did not inquire as to whether Barry could read, nor did Agent Gernados ask him if he in fact understood. *See Tague v Louisiana*, 444 U.S. 469 (1980) (holding that a waiver was involuntary because *inter alia* the arresting officer did not ask the suspect if he understood the rights read to him); *see also Robles-Ramirez*, 93 F.Supp.2d at 765 (taking issue with the fact that law enforcement did not ask the defendant if he could read). Therefore, while the remaining factors tip in favor of the Government, they are not enough to overcome the fact that the warnings were not in Barry's native tongue, there was no use of a translator, the rights were not explained to him at length, and his understanding was assumed but not confirmed.

### b. Consent to Search

Consents to search are recognized exceptions to the Fourth Amendment's warrant requirement. *U.S. v. Mendez*, 431 F.3d 420, 429 (5th Cir. 2005). To be valid, consent must be

---

[1] Though Agent Gernados did not deem it necessary to use a translator during the interview, testimony at the hearing revealed that other courts, including a magistrate court in this district, have provided Barry with translators during court proceedings. Additionally, this Court employed the use of a Fulani translator during the evidentiary hearing to aid Barry in understanding what was said during the proceeding.

given voluntarily, without duress or coercion. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Where, as here, a defendant challenges the voluntariness of a consent to search, the Government bears the burden to prove voluntariness by a preponderance of the evidence. *U.S. v. Arias-Robles*, 477 F.3d 245, 248 (5th Cir. 2007).

Voluntariness of consent is a finding of fact that must be evaluated under the totality of the circumstances. *Id.* The Fifth Circuit has outlined the following six factors to aid a court in making its determination: 1) the voluntariness of the defendant's custodial status; 2) the presence of coercive police procedures; 3) the extent and level of the defendant's cooperation with the police; 4) the defendant's awareness of his right to refuse consent; 5) the defendant's education and intelligence; and 6) the defendant's belief that no incriminating evidence will be found. *U.S. v. Hernandez*, 279 F.3d 303, 307 (5th Cir. 2002). While all of the enumerated factors are relevant to the court's analysis, no single factor is dispositive. *Id.*

If given equal weight, the factors tip in favor of the Government. Applying the factors, Barry voluntarily invited law enforcement into a private room to conduct the interview. As the Court has previously found, there was no hint of coercion. Furthermore, Barry was responsive to the agents' inquiries without objection. Finally, the agents advised him of his right to refuse the search. That said, the defendant's education and intelligence and his belief that no incriminating evidence would be found, militate against finding that the consent to search was given voluntarily.

Though testimony at trial revealed that Barry attended a Madrasa, or Koranic school, for eight years, it did not reveal that such schooling constituted a formal education. Additionally, even assuming *arguendo* that this could be considered a formal education, there is nothing in the record to suggest that the curriculum studied at the Madrasa would equip Barry with the ability

to comprehend legal concepts presented to him in English. Furthermore, the Court finds that there was a sufficient language barrier that would preclude a conclusion that Barry's consent was voluntary. Though the Government argues that Barry had a sufficient grasp of the English language as evidenced by his presence in the United States since 2003, his operation of businesses both in New York City and Baton Rouge, and his ability to attain a driver's license, the Court is not convinced that these things taken together allow for a finding that Barry had the requisite command of the English language to voluntarily give his consent. To the contrary, the evidence produced at the hearing demonstrated merely that Barry was capable of responding to routine questions and making basic inquiries. *See U.S. v. Isiofia*, 370 F.3d 226, 229, 233 (2d Cir. 2004) (deferring to the lower court's finding that the defendant had trouble speaking and understanding English despite the fact that the arresting officers obtained detailed information from the defendant). Therefore, this prong of the analysis works against a finding that the consent was given voluntarily.[2]

Finally, based upon his previous interaction with Agent Gernados at the March 17 enforcement operation, at which time he was informed of the illegal nature of his actions, Barry knew that incriminating evidence would be found in his private room. Therefore, the Court finds that the consent to search was involuntary and thus invalid.

---

[2] At the hearing, Brigitte Delzell, a French instructor for Louisiana State University's French Studies Department, testified as to her experience as a translator for Barry and his attorney. She testified that Barry had difficulty understanding legal concepts in French, his second language. Without according an undeserving amount of weight to Delzelle's testimony, the Court is persuaded by her contention that there is an appreciable difference for non-native speakers between being able to participate in routine conversation and being able to understand legal concepts.

## III.    Conclusion

Accordingly, the Defendant's motion to suppress (doc. 15) statements and items seized pursuant to the Statement of Rights Waiver and Consent to Search Form respectively is GRANTED.

Signed in Baton Rouge, Louisiana, on September 25, 2013.

**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**